| | |
|---|---|
| 1 | JONES DAY |
| | ROBERT A. MITTELSTAEDT, SBN 60359, |
| 2 | ramittelstaedt@jonesday.com |
| | CAROLINE N. MITCHELL, SBN 143124, |
| 3 | cnmitchell@jonesday.com |
| | 555 California Street, 26th Floor |
| 4 | San Francisco, CA 94104 |
| | Telephone: (415) 626-3939 |
| 5 | Facsimile: (415) 875-5700 |
| 6 | GIBSON, DUNN & CRUTCHER LLP |
| | SCOTT A. EDELMAN, SBN 116927, |
| 7 | sedelman@gibsondunn.com |
| | ANDREA E. NEUMAN SBN 149733, |
| 8 | aneuman@gibsondunn.com |
| | 333 South Grand Avenue |
| 9 | Los Angeles, California 90071-3197 |
| | Telephone: (213) 229-7000 |
| 10 | Facsimile: (213) 229-7520 |
| 11 | Attorneys for Plaintiff |
| | CHEVRON CORPORATION |

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

CV 09 5371 EMC

| | |
|---|---|
| CHEVRON CORPORATION, | Case No. _____ |
| Plaintiff, | |
| v. | **COMPLAINT FOR MALICIOUS PROSECUTION** |
| CRISTÓBAL BONIFAZ and THE LAW OFFICES OF CRISTÓBAL BONIFAZ, | |
| Defendants. | **JURY TRIAL DEMANDED** |

COMPLAINT AND JURY DEMAND

Plaintiff Chevron Corporation (hereinafter Chevron or Plaintiff), for its Complaint against the Defendants listed below alleges as follows:

## INTRODUCTION

1. In 2006, Defendant Cristóbal Bonifaz, an attorney, filed an action in this Court purportedly on behalf of certain individual Ecuadorians against Chevron and two affiliates, captioned *Gonzales v. Texaco Inc.*, No. C-06-02820 WHA (N.D. Cal.) (*Gonzales*). Before filing suit, Bonifaz had never met the individuals on whose behalf he purported to sue. He did not obtain authorization to sue for his purported clients in the United States. And he never had any probable cause to sue Chevron or its subsidiaries on behalf of those individuals. Nonetheless, he filed multiple pleadings in this Court falsely representing that *Gonzales* plaintiffs had cancer and that it was caused by Chevron's subsidiaries. He even dramatically alleged, falsely, that one plaintiff's child was suffering from leukemia and "slowly deteriorat[ing] from the cancer." But when that plaintiff was deposed under oath, Chevron and the Court learned that her child had never been diagnosed with cancer. In short, Bonifaz filed claims that were false. After two years of litigation, Chevron exposed those claims as fraudulent, resulting in their dismissal with prejudice, a finding by the Court that claims were "manufactured," and the imposition of terminating and Rule 11 sanctions.

2. The Court also dismissed as untimely other claims that Bonifaz had contended were timely without probable cause. And, as Chevron discovered and revealed the true facts that showed various claims brought in *Gonzales* were groundless, Bonifaz dismissed the claims of remaining plaintiffs that also had been brought without probable cause.

3. Bonifaz's conduct was neither accidental nor an innocent mistake. Bonifaz hired and paid someone in Ecuador to find "plaintiffs" as part of a pre-existing plan to sue Chevron. As the Court wrote: "It is clear to the Court that this case was manufactured by plaintiffs' counsel for reasons *other* than to seek a recovery on these plaintiffs' behalf. This litigation is likely a smaller piece of some larger scheme against defendants." The Court also found that Defendants "filed these actions in California, for reasons that have more to do with internecine quarrels among Texaco's antagonists than the interests of their plaintiffs."

- 1 -

COMPLAINT AND JURY DEMAND

4.      The larger scheme is a long-standing and ongoing unlawful effort by Bonifaz and other lawyers and entities to extort money from Chevron by blaming it for harms that are as non-existent as the false cancer claims of *Gonzales* plaintiffs and for environmental impacts that are the sole responsibility of the Ecuadorian government and its state-owned oil company, Petroecuador. Bonifaz has engaged in this scheme to further his own financial ends. He filed and publicized the *Gonzales* claims in an attempt to gain media attention and leverage as a key component of his efforts to extort money from Chevron. Bonifaz was maliciously motivated by a desire to retain or enhance his financial interest in litigation then pending against Chevron in Ecuador, where on information and belief his former colleagues and clients had terminated his services, as described below.

5.      The most-recently filed in the long-running scheme, the *Gonzales* case was the first and only time that the merits of such claims have been scrutinized by the United States judicial system and its truth-seeking processes. Once tested, the claims advanced in the names of the *Gonzales* plaintiffs were all dismissed.

6.      Bonifaz should be held liable for the full extent of the damages he has caused Chevron by his prosecution of the *Gonzales* action as part of his malicious scheme against Chevron and for exemplary damages to deter him and other lawyers from engaging in similar conduct.

## SUBJECT MATTER JURISDICTION

7.      This Court has subject matter jurisdiction over Chevron's claims under 28 U.S.C. § 1332. There is complete diversity of citizenship between the parties, and, as set forth in more detail herein, the amount in controversy exceeds $75,000, exclusive of interest and costs.

## PARTIES

8.      Plaintiff Chevron Corporation is a Delaware corporation with its principal place of business located at 6001 Bollinger Canyon Road, San Ramon, California, 94583. Chevron is therefore a citizen of Delaware and California.

COMPLAINT AND JURY DEMAND

9. On information and belief, Defendant Cristóbal Bonifaz is an individual residing in Massachusetts, with an intention to reside there indefinitely, and is therefore a citizen of Massachusetts. Bonifaz was counsel of record for plaintiffs in the *Gonzales* action.

10. On information and belief, Defendant the Law Offices of Cristóbal Bonifaz is a sole proprietorship with its principal place of business located at 180 Maple Street in Conway, Massachusetts, 01341. It is therefore a citizen of Massachusetts. On information and belief, the Law Offices of Cristóbal Bonifaz is managed, owned and/or operated by Bonifaz, counsel of record for plaintiffs in the *Gonzales* action, and at all times relevant to the allegations herein Bonifaz and the Law Offices of Cristóbal Bonifaz were alter egos, agents and representatives of each other and each is responsible for all actions taken by the other.

## PERSONAL JURISDICTION

11. Exercise of jurisdiction over each of the Defendants named herein is reasonable and proper in this District because the Defendants have purposefully availed themselves of the protections of this forum by filing and prosecuting the *Gonzales* action in this District against a resident of the State of California and Chevron's claims against Defendants arise in substantial part out of those actions.

12. Exercise of jurisdiction over each of the Defendants named herein is proper under California Code of Civil Procedure § 410.10, made applicable to this action by Rule 4(k)(1) of the Federal Rules of Civil Procedure.

## VENUE

13. Venue is proper in this District under 28 U.S.C. § 1391(a)(2), as a substantial part of the events giving rise to this action occurred in this District, including, but not limited to, the adjudication of the *Gonzales* action. In addition, the Defendants are subject to personal jurisdiction in this District.

## INTRADISTRICT ASSIGNMENT

14. The *Gonzales* action, which in substantial part gives rise to the claims herein, was filed and adjudicated in the San Francisco Division. Thus, assignment of this action to the

COMPLAINT AND JURY DEMAND
- 3 -

1  San Francisco Division is proper as a substantial part of the events giving rise to this action
2  occurred in the county served by that Division.

## FACTUAL ALLEGATIONS

### I. BACKGROUND

15. From 1964 to 1992, Texaco Petroleum Company (TexPet) was a minority shareholder in an oil exploration and production consortium (the Consortium) with the Corporación Estatal Petrolera Ecuatoriana, now known as Petroecuador (Petroecuador), in the Oriente region of Ecuador (the Concession Area) pursuant to concession agreements with, and subject to the regulatory authority of, the government of Ecuador. In 1990, Petroecuador became the Consortium's operator, and in 1992 it took over 100% ownership of the Consortium and all Consortium facilities and operations. Since 1992, TexPet has had no ownership interest or involvement in oil exploration or production activities in Ecuador.

16. In October 2001, Texaco Inc. (Texaco) merged with a subsidiary of Chevron. As a result, Texaco and TexPet became and remain subsidiary corporations of Chevron.

17. In 2003, Bonifaz and others participated in filing a lawsuit against Chevron on behalf of 48 Ecuadorians in Lago Agrio, Ecuador (Lago Agrio Litigation). Bonifaz and others created and participated in an organization called *Frente de Defensa de la Amazonia* (a/k/a the Amazon Defense Front or the Amazon Defense Coalition) (hereinafter the Front) to receive and control proceeds from the lawsuit.

18. In early 2006, on information and belief, the Front and the Lago Agrio plaintiffs terminated Bonifaz as their lawyer. This termination cut off or threatened to cut off Bonifaz's financial interest in the outcome of the Lago Agrio Litigation, which is ongoing.

19. In retaliation against the Front and the Lago Agrio plaintiffs and motivated by continuing ill will and malice against Chevron, Bonifaz plotted to bring a lawsuit against Chevron in the United States.

### II. THE *GONZALES* ACTION

20. In furtherance of that plan, Bonifaz paid Ecuadorian attorney Gerardo Peña Matheus (Peña) to find "three or four people" in the Concession Area with "some form of

- 4 -

COMPLAINT AND JURY DEMAND

cancer," and to provide him with a letter from "any medic who has examined these people that says in his opinion there is at least a 51% probability that the cancer was caused by the fact that these people have been exposed to the petroleum contamination …." He wrote to Peña that "with this last action in court that I am planning we will give Chevron 'la copa de gracia.'"

21. In response to Bonifaz's request, Peña or individuals working on his behalf identified a few Oriente residents as potential plaintiffs for Bonifaz's planned lawsuit. On information and belief, they did not obtain any letter from any doctor, any medical records, or any other evidence that the individuals had cancer or that their "cancer" was caused by the Consortium's operations; the only documents relating to these potential plaintiffs that Peña provided to Bonifaz were "intake forms" filled out by a paralegal or other individual working on Peña's behalf that provided no basis for filing a lawsuit.

22. On or about April 25, 2006, despite never having met with his putative clients nor having obtained their authorization to sue in the United States, Bonifaz and his law firm, along with Terry Collingsworth and Paul Hoffman, filed the *Gonzales* action in this Court on behalf of a purported class consisting of "residents of the Amazonian rainforest region of Ecuador, known as the Oriente" who allegedly "contracted cancer, or who now suffer from an increased risk of contracting cancer and other diseases," allegedly due to the Consortium's operations. Although TexPet was the minority shareholder in the Consortium, Defendants did not sue Ecuador or Petroecuador.

23. The original *Gonzales* complaint alleged causes of action for unjust enrichment and violations of California's Unfair Competition Law, California Business and Professions Code §§ 17200, *et seq.*, and sought disgorgement of TexPet's profits, which were alleged to be in the billions of dollars and comparable to the damages sought in the competing Lago Agrio Litigation.

24. The original complaint was dismissed with leave to amend because the facts alleged were insufficient to state a valid claim.

25. Defendants, together with Collingsworth and Hoffman, filed an amended complaint on or about October 12, 2006, dropping the class action allegations and alleging

- 5 -

COMPLAINT AND JURY DEMAND

personal injury claims for nine plaintiffs based on causes of action for negligence, intentional or reckless infliction of emotional distress, and battery.

26. The claims of all nine *Gonzales* plaintiffs were made by Defendants without probable cause.

27. The original and amended complaint claimed that Gloria Vera Chamba's (Chamba) minor son had leukemia caused by Chevron's subsidiaries. At deposition, Chamba admitted that her son never had leukemia. Chevron also established during discovery that Chamba's son never lived in the Concession Area and thus Defendants never had any basis to allege that TexPet caused her son any injury. Indeed, the evidence revealed that Chamba had filed claims in Ecuador against Petroecuador, alleging that the state-owned oil company was responsible for causing her son's alleged illnesses and contradicting the claims asserted against Chevron on her behalf and on behalf of her son. Chamba's claims were dismissed by the Court and, as the Court found in its Rule 11 order, were "bogus claims that should never have been on the books" and "baseless and made without reasonable and competent inquiry."

28. The original and amended complaint alleged that Luisa Jame Gonzales (Gonzales) had breast cancer caused by Chevron's subsidiaries. At deposition, Gonzales admitted that she did not have breast cancer. She testified that she had previously told Bonifaz or his co-counsel that she did not have breast cancer. Her claims were also eventually dismissed by the Court in *Gonzales* and were likewise "bogus claims that should never have been on the books" and "baseless and made without reasonable and competent inquiry."

29. The original and amended complaint alleged that Nixon Rodriguez Crespo (Rodriguez), the husband of Gonzales, had a fear of cancer and suffered injuries as a result of his wife's alleged "breast cancer." At deposition, Rodriguez admitted that the claims asserted in his name were false. Those claims were also dismissed by the Court in *Gonzales* and were also "bogus claims that should never have been on the books" and "baseless and made without reasonable and competent inquiry."

30. The original and amended complaint alleged that Vilma Jacqueline Moreno Chuquiom (Chuquiom) had breast cancer caused by Chevron's subsidiaries and that her husband

Tobias Alberto (Alberto) had a fear of cancer and suffered injuries as a result of his wife's alleged breast cancer. On information and belief, Chuquiom never had breast cancer and Bonifaz never had any probable cause to make those allegations. On information and belief, Bonifaz did not even have an "intake form" for Chuquiom or Alberto. The claims asserted in the names of Moreno and Alberto were dismissed by the Court in *Gonzales* for failing to answer Chevron's discovery concerning their purported illnesses.

31. The original and amended complaint alleged that Luz Armas Cadena (Armas) had lymphoma and thyroid cancer caused by Chevron's subsidiaries and that her husband Jose Bonilla (Bonilla) had a fear of cancer and suffered injuries as a result of his wife's alleged conditions. Those claims were barred from the outset by res judicata or the statute of limitations. Armas and Bonilla had sued TexPet in Ecuador in 1997 claiming, in part, damages for Armas' alleged health problems. On information and belief, Bonifaz never had any probable cause to allege any claims on behalf of Armas and Bonilla against Chevron. On information and belief, he did not even have an "intake form" for Bonilla. Bonilla's claims were voluntarily dismissed following cross-examination at deposition concerning the lawsuit he had previously filed against TexPet in 1997. Armas' claims were dismissed by the Court as barred by the applicable statute of limitations. On information and belief, Bonifaz had no probable cause to believe that the claims of Armas and Bonilla were valid.

32. The original and amended complaint alleged that Maria Cano Zambrano (Cano) had uterine cancer caused by Chevron's subsidiaries and that her husband Arturo Alava (Alava) had a fear of cancer and suffered injuries as a result of his wife's alleged condition. Cano did not have uterine cancer; she had a cervical condition that Cano's own Ecuadorian treating physician, from the national cancer institute, testified was likely caused by the human papillomavirus (HPV) and for which petroleum is "not considered in the risk factors." In addition, Cano's claims were barred from the outset by the statute of limitations. On information and belief, Bonifaz never had any probable cause to allege any claims on behalf of Cano and Alava against Chevron. On information and belief, he did not even have an "intake form" for Alava. Alava's claims were voluntarily dismissed after cross-examination at deposition concerning how his wife contracted

- 7 -

COMPLAINT AND JURY DEMAND

HPV. Cano's claims were dismissed by the Court as barred by the applicable statute of limitations. On information and belief, Bonifaz had no probable cause to believe that the claims of Armas and Bonilla were valid.

33. During the course of the *Gonzales* litigation, Bonifaz engaged in conduct designed and intended to prevent Chevron and the district court from discovering that the Chamba, Gonzales and Rodriguez claims were fabricated.

34. Among other things, between December 2006 and February 2007, Bonifaz concealed the existence of the "intake forms" that revealed the lack of merit in his clients' claims. In February 2007, Bonifaz participated in propounding interrogatory responses that, for Chamba, "perpetuated the pretense of the viability of the claims in the case rather than coming clean and dismissing the claim" and, for Gonzales, " perpetuated the claim of cancer, although counsel surely knew or should have known by this point that Plaintiff Gonzales had no cancer at all." In May 2007, Bonifaz participated in propounding supplemental interrogatory responses from Gonzales claiming cancer even though, as the Court found, "[c]ounsel knew by this point that there was no cancer and the supplemental answer was a smokescreen to avoid dismissal of a meritless claim."

35. On October 16, 2007, the district court in *Gonzales* imposed monetary sanctions on Bonifaz (as well as Collingsworth and Hoffman) on a *sua sponte* motion under Rule 11 of the Federal Rules of Civil Procedure. The Court found that Bonifaz "knew or should have known (i) that the claims made by plaintiffs Chamba, Gonzales, and Rodriguez were baseless, (ii) that their pre-suit inquiry was neither reasonable nor competent, (iii) that counsel failed to follow up on pre-suit warning flags that spelled trouble, and (iv) that none of the three plaintiffs gave consent to file suit in the United States, much less informed consent."

36. Final judgment was entered against all of the *Gonzales* plaintiffs and in favor of Chevron, Texaco, and TexPet on November 15, 2007. The *Gonzales* plaintiffs did not appeal the judgment against them. Bonifaz paid the sanctions fine as ordered by the Court and did not appeal the sanctions against him.

COMPLAINT AND JURY DEMAND

37. The pretrial investigation conducted by Bonifaz into the merits of his "clients'" claims was patently unreasonable and virtually nonexistent.

38. Bonifaz's filing and prosecution of the *Gonzales* lawsuit without conducting a reasonable investigation evidences malice.

### III. ADDITIONAL MALICE: THE LARGER SCHEME AGAINST CHEVRON

39. Further, as the Court stated: "It is clear to the Court that this case was manufactured by plaintiffs' counsel for reasons *other* than to seek a recovery on these plaintiffs' behalf. This litigation is likely a smaller piece of some larger scheme against defendants." The Court also found that Defendants "filed these actions in California, for reasons that have more to do with internecine quarrels among Texaco's antagonists than the interests of their plaintiffs."

40. The larger scheme against Chevron and its affiliates involves a long-standing attempt by Bonifaz and others to extort money from Chevron for improper purposes and their own benefit by blaming Chevron for causing cancer in individuals who do not have cancer and for being responsible for environmental problems that are the responsibility of Ecuador and the state-owned oil company, Petroecuador.

41. TexPet, Ecuador, and Petroecuador entered into a Settlement Agreement in 1995 which provided in part that TexPet would perform specified remediation in exchange for a full release of claims. In 1998, Ecuador and Petroecuador executed an *Acta Final* (hereinafter 1998 Final Release), which certified TexPet's performance of its remedial obligations and "release[d], absolve[d] and discharge[d]" TexPet and any affiliates from "any liability and claims" resulting from the Consortium's operations. TexPet also provided funding for potable water, sewage, and other projects pursuant to separate settlement agreements with local governments near the Concession Area. Agreements with the four primary municipalities (Lago Agrio, La Joya de los Sachas, Francisco de Orellana, and Shushufindi) were confirmed and approved by courts in each municipality. TexPet entered into similar agreements with the Province of Sucumbíos, and with a coalition of smaller municipalities in Napo province, each of which broadly released TexPet, its parent company, affiliates, and principals from liability or claims resulting from the Consortium's operations.

42. Against this background, upon information and belief, Bonifaz and others engaged in the following acts for the purpose of circumventing the 1998 Final Release and extorting money from Chevron for their own illicit purposes:

(a) After Ecuador and Petroecuador released all claims against TexPet, Bonifaz and others working in concert with him lobbied the Ecuadorian government to enact legislation (which they helped draft) aimed illegally and unconstitutionally at circumventing the 1998 Final Release and purportedly and illegally allowing Bonifaz and others to sue TexPet and its affiliates in Ecuador.

(b) Bonifaz entered into a collusive agreement with Ecuadorian officials whereby he, and those working with him, agreed not to sue Ecuador or Petroecuador for any environmental impacts for which they are responsible, in exchange for the Ecuadorian government's assistance and participation in lawsuits that Bonifaz and his cohorts would bring against Chevron, Texaco, and TexPet. Bonifaz presented Ecuador's Attorney General with notarized documents agreeing not to pursue any legal action against Ecuador. As Bonifaz publicly stated: "[I]f the U.S. court finds both Petroecuador and Texaco liable, we will not accept the percentage of the claim assigned to [Petroecuador]."

(c) As noted above, in 2003, Bonifaz and others funded and participated in filing a lawsuit against Chevron on behalf of 48 individual Ecuadorian plaintiffs in the Superior Court of Nueva Loja, Ecuador. Bonifaz and those working in concert with him sought to evade the provisions of the 1998 Final Release by claiming that the judgment they sought against Chevron for, among other things, funding further environmental remediation, should not be paid to the government of Ecuador, but should instead be paid to the Front, a non-governmental organization created and controlled by them. Bonifaz had substantial involvement with the organization and activities of the Front in Ecuador and in the United States and was designated as its legal representative in connection with the Lago Agrio Litigation and other related matters.

(d) Bonifaz and those working in concert with him, including principals and agents of the Front, further sought to evade the provisions of the 1998 Final Release by encouraging the Ecuadorian government to attempt to nullify the 1998 Final Release by claiming that it had been

obtained by fraud and by issuing sham criminal indictments against its signatories, including two persons that signed on behalf of TexPet.

  (e) Bonifaz and those working in concert with him to prosecute the Lago Agrio Litigation formed and operated a company in Ecuador known as "Selva Viva" to transmit funds to Ecuador for use in prosecuting the Lago Agrio Litigation and other activities in Ecuador and the United States pursuant to their scheme against Chevron.

  (f) Bonifaz and those working in concert with him including principals and agents of the Front and Selva Viva, and principals and agents of other non-governmental organizations in the United States and Ecuador, including without limitation Amazon Watch, Oilwatch, Accion Ecologica, Esperanza International, and E-law, have sought to raise funds to support their prosecution of the Lago Agrio Litigation and related activities in Ecuador, the United States, and other countries by making false and malicious statements about Chevron, and have transmitted the proceeds of their fund-raising activities to the Front, Selva Viva, and other organizations and individuals to prosecute the Lago Agrio Litigation and conduct related activities pursuant to their scheme against Chevron.

  (g) In 2004, Chevron and Texaco commenced an arbitration proceeding against Petroecuador, seeking indemnification for costs and expenses incurred by them in connection with the Lago Agrio Litigation. After Bonifaz sought to represent Petroecuador and Ecuador in order to further his interest in pursuing a litigation scheme, Petroecuador and Ecuador—represented by Bonifaz—filed suit in the United States District Court for the Southern District of New York seeking to enjoin the arbitration. Bonifaz was later dismissed as counsel for Petroecuador and Ecuador.

  (h) In or around February 2006, the Front terminated its relationship with Bonifaz. In a resolution dated February 17, 2006, the Executive Committee of the Front announced that from that day forward Bonifaz would "not be able to execute any act on behalf of the affected related, directly or indirectly, with our legal case." According to the Front, "Bonifaz was discharged from any connection to the Lago Agrio case . . ."

COMPLAINT AND JURY DEMAND

43. Accordingly, on information and belief, upon being terminated by the Front and risking the loss of his financial interest in the Lago Agrio Litigation, Bonifaz sought to bring his own lawsuit against Chevron in competition with the Front. As Bonifaz stated in a declaration filed with this Court, the Front "is likely to see [the *Gonzales*] action as a threat to the money and political power that [it] has gained and/or hopes to gain from the Lago Agrio [L]itigation."

## CLAIM FOR RELIEF

## FOR MALICIOUS PROSECUTION

44. Chevron realleges and incorporates herein by reference all of the preceding and following paragraphs of this Complaint.

45. The *Gonzales* action was initiated in the United States District Court for the Northern District of California against Chevron, Texaco, and TexPet by or at the direction of Defendants.

46. The *Gonzales* action was continued by or at the direction of Defendants to a legal termination on the merits in favor of Chevron. Final judgment in the *Gonzales* action was entered in Chevron's favor on November 15, 2007.

47. Defendants did not have probable cause to file claims in the names of the *Gonzales* plaintiffs against Chevron or its subsidiaries. Defendants knew or reasonably should have known that the *Gonzales* plaintiffs' claims were without merit. Defendants perpetuated the claims after they knew or should have known that those claims had no merit. Defendants acted to conceal that the *Gonzales* plaintiffs' claims had no merit.

48. In initiating and perpetuating the *Gonzales* action, Defendants acted primarily for a purpose other than succeeding on the merits of the *Gonzales* plaintiffs' claims. That purpose includes, but is not limited to, actual hostility or ill will toward Chevron, and a desire to preserve Bonifaz's status as a broker in a larger scheme against Chevron that was unrelated to the merits of the claims of the particular plaintiffs in the *Gonzales* action.

49. In initiating and continuing the *Gonzales* action, Defendants acted with oppression, fraud, and malice, including, but not limited to, acting with an intent to cause injury

COMPLAINT AND JURY DEMAND

1  to Chevron, and engaging in despicable conduct with a willful and conscious disregard of the
2  rights of others, including the *Gonzales* plaintiffs (their purported clients) and Chevron.

3      50.    As a direct and proximate result of Defendants' conduct, Chevron was forced to
4  expend a significant amount of time and money in defending the meritless claims filed in the
5  name of the *Gonzales* plaintiffs. Further, Chevron suffered significant harm to its reputation and
6  business interests. These damages have resulted in harm to Chevron in an amount in excess of
7  the jurisdictional limit of this Court. The conduct of Defendants, individually and collectively,
8  was a substantial factor and proximate cause in bringing about Chevron's harm.

**PRAYER**

WHEREFORE, Chevron prays for relief as follows:

1. For special damages including attorneys' fees and other costs in defending the *Gonzales* action, damage to reputation and harm to business interests, in an amount to be proven at trial in excess of $4 million;

2. For general damages according to proof at trial;

3. For attorneys' fees and costs of suit herein;

4. For punitive damages in such amount as the Court may deem appropriate to penalize Defendants for their intentional and malicious misconduct;

5. For prejudgment interest; and

6. For such other relief as the Court may deem Chevron entitled to receive.

COMPLAINT AND JURY DEMAND

Date: November 13, 2009

                JONES DAY
                Robert A. Mittelstaedt
                Caroline N. Mitchell

                GIBSON, DUNN & CRUTCHER LLP
                Scott A. Edelman
                Andrea E. Neuman

By: /s/ Robert A. Mittelstaedt
                Robert A. Mittelstaedt
          Attorneys for Plaintiff Chevron Corporation

## **DEMAND FOR JURY TRIAL**

Plaintiff Chevron Corporation hereby demands a jury trial of all issues in this action triable as of right by a jury.

Date: November 13, 2009

By: /s/ Robert A. Mittelstaedt
                Robert A. Mittelstaedt
          Attorneys for Plaintiff Chevron Corporation

SFI-623605v1

- 14 -

COMPLAINT AND JURY DEMAND